PLEUS, Judge
(dissenting).
It is with the utmost reluctance tiiat I find it necessary to render my first dissent. Were the matters involved not as fundamental as they appear to me to be, I would merely note such dissent. However, in view of what I conceive to be a further erosion upon the judicial power by an extension of the limits heretofore imposed upon administrative action by our Supreme Court, I feel constrained to note my reasons.
The importance of such administrative regulation as may be imposed by the legislature upon citrus fruit dealers for the benefit of this industry so vital to our state cannot be made to serve as the excuse for the exercise of so called quasi-judicial power in excess of valid grants by the legislature in accordance with organic restraint. Merely under the guise of protecting a segment of our economy we cannot justify unathorized administrative action.
The statutes involved are set forth in the majority opinion except for Section 601.65, Florida Statutes 1955 F.S.A., which is important as showing the intended scope of the administrative action which the Commissioner seeks to justify. This section reads as follows:
“If any citrus fruit dealer violates any provisions of this law he shall be liable to the person injured thereby for the full amount of damages sustained in consequence of such violation. Such liability may be enforced either (1) by complaint to the commissioner, as provided in § 601.66 or (2) by suit in any court of competent jurisdiction; but this section shall not in any way abridge or alter the remedies now existing at common law or by statute, and these provisions are in addition to such remedies.”
Avowedly the above section attempts to make liability for all damages sustained enforceable either by the Commissioner or by a court of competent jurisdiction at the option of the complainant. That is exactly what was sought to be accomplished so far in these proceedings. In fact, a complaint had already been instituted in the Circuit Court of Orange County to obtain redress and it was dismissed by the plaintiff on the day the complaint was filed with the Commissioner so that the latter “might have jurisdiction of the complaint.”
Such complaint as set forth in full in the majority opinion was filed January 27, 1956 and alleges that a contract had been entered into on January 3, 1956 by the complainant and the appellant here, a copy of such contract being attached to the complaint. This was the first error in the complaint because according to the “meager record” before the “duly designated offi *361 cer” [1] of the Commissioner of Agriculture, the contract was actually entered into on January 6, 1956. The complaint further recites that the appellant “picked 4,118 boxes of fruit between January 6, 1956 and January 16, 1956, and thereby became indebted to the complainants in the sum of $6588.80 of which $500 was paid to the complainants when the contract was made.” The “meager record” does show conclusively that Townsend Fruit Company neither ' picked any of the fruit nor did it make the $500 down payment to the complainant.
Based upon this complaint (which was merely in the form of a letter from complainant’s counsel to the Commissioner) and, on the letterhead of the Citrus and Vegetable Inspection Division signed by the so-called “duly designated officer”, Townsend Fruit Company was transmitted a copy of such complaint and notified that the sole specific charge against which it was called upon to defend was:
“You have failed and refused truly and correctly to account and make full payment promptly for citrus fruit purchased from the petitioner during the 1955-1956 season.”
Townsend was also advised in the same notice that it was called upon to satisfy the complaint or answer the same in writing not later than February 4, 1956 — approximately seven days after the complaint and notice were mailed to Townsend. Upon answer by way of denial having been filed by Townsend the matter then came on for hearing before the said Mays on March 2, 1956, the transcript of which recites him to be an “officer of the Department of Agriculture heretofore designated by the Honorable Nathan Mayo, Commissioner of Agriculture, * *
My evaluation of the admittedly “meager record” indicates the following to be the facts:
1. That on or about January 3, 1956 Driskell Townsend, the president of Townsend Fruit Co. signed a Townsend Fruit Company’s contract form for the purchase of an estimated 4000 boxes of oranges at $1.60 per box on the tree from E. B. Conoley, as trustee. At the time it was signed it was completely filled out showing the name of the grower as seller and Townsend as buyer; the price per box; the estimated volume of fruit and a statement acknowledging receipt of .$500. However, the picking date was left blank and the contract delivered to Hudson, a broker, or in the language of the trade, a ‘‘bird dog”, with specific instructions to secure a January 15, 1956 picking date. Upon Conoley’s agreeing to such date it was to be inserted in the contract, the same was then to be signed by Conoley and returned to Townsend and the required deposit would then be provided by Townsend. It was clear that Townsend agreed to buy, and Hudson understood this fact fully, only if the specific picking date could be obtained. The contract, after acknowledging receipt of the part payment of $500, provided that the balance should be paid “when fruit is gathered”. It was provided that at time of delivery of fruit it would be merchantable, free of frost and dryness and of the maturity required for frozen concentrate. It was warranted against a prior sale and any existing liens or contracts.
*362 2. Three days later and on January 6, 1956 Hudson took this contract form so signed by Townsend to Conoley hut did not disclose his instructions regarding the picking date. On the other hand Hudson inserted the date of January 10, 1956 as the picking date. Conoley signed the contract on January 6, 1956.
3. The facts are not clear from the record as to actually what occurred when Hudson was dealing with Conoley.[2] According to Hudson, when he was unable to get Conoley to agree to the January 15 date he then contacted another broker named Hull who in turn contacted a licensed and bonded dealer named Hughes who agreed to buy the crop at $1.65 per box and begin picking immediately. Hughes testified that he had purchased the crop through Hull without any knowledge that Townsend was involved. Hudson further testified that through Hull, Hughes had agreed he could pick the fruit by January 10 and that he had been reimbursed the $500 part payment by Hughes. Hughes corroborated this and stated that he had harvested the entire crop and was liable for the purchase price.
Following the hearing and on May 28, 1956 the Commissioner entered his order as copied in full in the majority opinion. He finds that complainant and Townsend had entered into a written contract on January 3, 1956 which was an erroneous date under the uncontradicted testimony before him; he leaves the inference that the down payment was made by Townsend which likewise is untrue under the uncontradicted evidence. He finds from what he terms the “rather meager record of testimony” that D. R. Hughes got the fruit from the petitioner’s grove. There is no question that Hughes did so. He specifically -admitted that he did, that he had actually advanced the down payment and that he was liable for the value of the fruit, having purchased the same through a broker named Hull who in turn had dealt through Hudson. But then the finding engages in speculation and therein, without any predicate in the testimony, it is announced that “the fruit undoubtedly was picked pursuant to and by virtue of, the contract aforesaid.” This deduction is then followed by a frank admission that “Just what the hook-up between Townsend Fruit Company, Inc., and D. R. Hughes was, is not very clear from the record, but the undersigned Commissioner is satisfied from what does appear in the record that the fruit in question was picked because of the contract of sale signed by petitioner and Townsend Fruit Company, Inc.” Thus it is that without even enough evidence to satisfy an administrative officer and in the face of his own inability to find such predicate, he resorts to pyramiding an inference on an inference and thus sustains the complainant’s claim. This should be sufficient to reverse the court below on no other rule than that even the action of an administrative official must be supported by competent substantial evidence to justify such action.[3]
We may assume that by applying the principles of an agency by estoppel or a principal being bound by the acts of his agent within the apparent scope of the agent’s authority, there was a subsisting contract between Townsend and Conoley. That this contract was executory and never performed by Townsend is beyond peradventure of doubt. Nor does it make any difference whether title to the fruit passed at the time of its execution. The majority opinion holds that it did. It is the writer’s opinion that it did not.[4] The fact is that *363 Townsend did not gather the fruit and thus the petitioner had no cause against Townsend except for breach of contract in which his damages would be the difference between what Townsend had agreed to pay and what petitioner had otherwise realized from a sale of the fruit; or assuming, which was not proved in the record, that the action by Townsend placed it in the hands of Hudson to work some kind of fraud upon complainant there might have been an action sounding in tort for deceit. The majority opinion ties to this latter theory and holds that the acts of Hudson “produced the situation about which this controversy arose.” This is conclusively answered by merely going back to the complaint and notice to show that no such issues were before the Commissioner and it is extremely doubtful even under his “broadened” powers that he would have authority to adjudicate liability in the face of such issues; and thus we conclude that the maxim concerning one of two innocent parties is wholly inapplicable.
Nor do we think that there was any basis for Townsend to object to “the form of the complaint” nor did it have much option except to submit the controversy for determination on its merits. But that is not to say that the Commissioner may then go far and beyond the issues and as I see it, far and beyond his authority as limited by prior decisions of the Supreme Court, and thus bind Townsend.
We then come to the crux of this matter and that is whether the case of Mayo v. Lent, Fla.1950, 45 So.2d 879 is controlling.
Approximately one year before Lent and on May 6, 1949 the Supreme Court decided the two cases of Mayo v. Market Fruit Co. of Sanford, Inc., Fla., 40 So.2d 555, rehearing denied June 9, 1949; and Mayo v. New, Fla., 40 So.2d 365. The opinions in these cases, as definitely construed in the later decision in Lent, supra, go no further than to hold that where there is a contract for the purchase and sale of citrus fruit and the contract is breached by nonperformance on the part of the purchaser, the limit and extent to which the Commissioner could go under the then statutory authority was to-require the purchaser to account and pay for the fruit actually picked by the purchaser and discipline him for his default in that regard. As stated in Market Fruit Co., supra [40 So.2d 558]:
“Of course if actual damage is shown to have grown out of the contract because of his failure to take the remainder of the crop, that could be determined in a proper proceeding in a court of competent jurisdiction.”
I interpret this to mean that it could be determined only in a court of competent jurisdiction. If such damage arising by failure to take part of the crop can be deter-1 mined only in a court of competent jurisdiction, a fortiori, damage for failure to take any of the crop can be determined only in such court. Further, in Lent, [45 So.2d 881] the Supreme Court announces that the sole effect of its decision in Market Fruit, supra, was that the Commissioner “could discipline the buyer not only for failure to furnish a statement but also for failure to pay for the fruit shown by his own statement to have been received, * * * ”; and that its decision was merely that the Commissioner “had the authority to require the payment for the fruit actually picked and to-discipline the packers for their default in-this regard.” (Emphasis supplied.) Obvi *364 ously the court meant actually picked by the person sought to be disciplined.
In Lent, supra, there was a contract of purchase and sale whereby the dealers had agreed to purchase the crop for $1.50 per box with a $250 down payment having been made. The dealers did not perform and the entire crop was then sold to a third party at $.50 per box. The notice served on the dealers charged them with having “failed and refused truly and correctly to account” for the fruit. This, of course, could refer only to the fruit purchased under the contract.[5] The Commissioner entered his order awarding damages to the complainant and requiring the dealers to pay the sum of $2,985 and upon failure so to do advising them their license would be suspended. This amount was arrived at by multiplying the number of boxes by $1.50 per box, the contract price, deducting therefrom the $.50 per box for which the grower had sold to the third party and crediting the initial payment of $250.
After reviewing, interpreting and definitely defining the limits of its prior decision in Market Fruit as above indicated, the Supreme Court without hesitation affirmed the Circuit Court in quashing the order of the Commissioner as being beyond his authority. The court predicated its decision upon the fact the buyer had received no fruit whatever and could not be penalized for failure to furnish a statement or to pay the amount indicated in such a statement to be due. It specifically held in Lent that in Market Fruit it had had no occasion “to determine the commissioner’s authority with reference to the fruit not gathered” and then held:
“Whether the Commissioner of Agriculture has the power to punish for a breach of a contract determined by him to have been committed is a point of law which we leave for the future, as that was not the specific charge here.”
The Court then concluded its opinion by holding that the charge the appellees were required to meet did not furnish a basis for the order entered.
Unless we resort to distinctions without differences Lent is, to my mind, absolutely indistinguishable from the case at bar. The alleged bases upon which the majority opinion finds Lent to be “easily distinguishable” are not valid. The first one is the statement that the fruit had not been picked in Lent whereas in our case it had been picked. The fact is that in both cases the fruit had been picked by persons other than the purchaser. The second basis is the “broadened provisions of the statute”. The provisions so referred to are those which the writer assumes were probably enacted by the 1949 session of the legislature to bridge the gap. in the delegated quasi-judicial power found to exist in Market Fruit and New.[6] These provisions were added to § 596.11(4), now § 601.64, Florida Statutes 1955, F.S.A., by Chapter 25149, Laws of Florida Acts of’ 1949 and purport to make it unlawful for' any citrus fruit dealer “to fail without rea-’ sonable cause to perform any specification or duty express or implied arising out of' any undertaking in connection with any' such transaction; * * *” "
. We dispose of the applicability of this 1949 provision by holding that the Commissioner did not proceed thereunder but filed his formal notice and “charge” by setting forth a failure and refusal truly and cor-, rectly to account and make full payment for the fruit purchased.[7] Secondly, if the Corn- *365 missioner had attempted to proceed under the broadened provisions we would then have been met, as would have counsel in the court below, with the question, and grave indeed it is, of the constitutional validity of such delegation of real judicial power. Therefore it is no answer to say, as does the majority opinion, that the validity of the statute was not questioned because counsel was entitled to rely upon the prior decisions holding that under a charge of failure to account and pay for fruit purchased, the citrus dealer could not be penalized or damages awarded against him on account of breach of contract.
The last basis for distinction which the majority opinion advances was that Townsend was bound by the acts and conduct of its agent, Hudson, and his acts “in the main produced the situation about which this controversy arose.” This is indeed a novel predicate for legal liability for breach of contract. Regardless of the “meager record” I am willing to concede, arguendo, that there was a subsisting contract between Townsend and Conoley effected by the act of Hudson acting within the apparent scope of his authority as agent for Townsend. But on a charge of failure to account and pay for the fruit this is as far as the agency is relevant; and because of actions by the agent after the signing of the contract, we cannot hold Townsend responsible in a proceeding such as was had before the Commissioner’s agent as approved by the court below. It is interesting to note that the majority opinion feels that “we are not called upon to determine at this late date the sufficiency of the complaint upon which the defendants were tried before the Commissioner.” To be sure, from the record produced and the action taken by the Commissioner, the appellants here were in-truth", and in fact “defendants” who were being “tried” before the Commissioner. It is not a question of the “sufficiency” of the complaint or the notice or the charge; rather it is that neither the complaint, the notice, or the charge contemplated the action taken by the Commissioner nor justified it under the aforementioned “broadened provisions” inserted in 1949.
Thus it is that appellants here did. not have to attack the validity of the added provisions for the simple reason that the Commissioner was not proceeding thereunder. When however the Commissioner and the complainant come before this court and for the first time invoke and rely upon the “broadened provisions” of the statute— which to the writer’s mind are bedecked completely with red flags of invalidity — in their joint attempt to sustain the Commissioner’s action favorable to the complainant, we cannot sanction such action by holding that no question of validity was theretofore raised. To do so, the court would have to overlook the fact that such provisions are for the first time invoked here.
Thus by grounding the authority of the ■’ Commissioner on the broadened provisions,'-1 when those were not invoked’in the-first-'' instance by him, as the predicate for his : authority, we ourselves are injecting the-grave constitutional question which the ' writer prefers not to do.
While frankly admitting that the prior., decisions in New and Market Fruit, supra, sustain the procedure whereby in one fell swoop the Commissioner may adjudicate liability, make a money award in an ádversáry proceeding and enforce it by requiring payment within a specified period or the dealer’s *366 license’would be suspended and he would no long-er.be entitled to engage in a lawful calling, we believe that such proceedure cannot be sustained on the theory that it is a mere act-of “discipline” or “punishment”. As a matter of fact, as we all know, such action would in many instances be far more effective than a common-law execution. Nowhere in this record is the writer able to find the slightest semblance of a notice that Townsend’s license was in jeopardy until it was served with the final order of the Commissioner giving it fifteen days to pay up or quit business. Every element of fair play, if not mandatory requirements of due process, require otherwise. Our statute is specific and by § 601.67 the authority of the Commissioner to revoke or suspend a license is dependent upon the fundamental basic requirements of due process, namely, notice and hearing — and that notice must at least by implication if not express words let the licensee know that his license is in jeopardy. Prior decisions of the Supreme Court justify this view and we may confidently affirm that such license whether a right or a privilege or a privilege in the nature of a right, vested or otherwise, is of substantial and in many instances, indispensable value to the holder which cannot be capriciously or arbitrarily revoked or suspended; but the deprivation thereof must take place only in the manner and on the grounds provided by law. Carnegie v. Department of Public Safety, Fla. 1952, 60 So.2d 728; State ex rel. Paoli v. Baldwin, 1947, 159 Fla. 165, 31 So.2d 627. Surely the license of one to engage in the lawful business of dealing in citrus fruit is entitled to as much protection as the license of one authorized to train horses on the racetracks in this state or of the license of one to drive an automobile on the highways of this state. Surely, too, the need for regulation in the latter two instances is far greater than the need for regulation of citrus dealers to protect the growers of this state whom this writer has observed during his thirty years of residence in the heart of the citrus belt to be thoroughly capable in every respect of exercising sound business judgment and protecting themselves in their contractual dealing without the need of administrative paternalism. Cf. the language of Justice Buford in Bowers v. Dr. P. Phillips Co. cited in footnote 4, supra.
And finally, the majority opinion has now, in effect, made available to the complainant as prima facie evidence the findings and orders of the Commissioner for use in an action in a court of competent jurisdiction seeking to obtain a money judgment. Thus, based upon a record devoid of competent substantial evidence, based upon false issues and a resultant void order beyond the authority of the Commissioner, the majority opinion is content to beg the question and blind itself to what every lawyer knows will be the result in the courtroom when the findings and order are introduced in evidence by saying that we are not concerned with that part of the statute which gives to such findings and order virtually impregnable verity.
Now to recapitulate:
1. Under the notice and charge served upon Townsend and the section of the statute invoked, Lent is controlling and indistinguishable on the facts; and instantly it was shown that the purchaser under the contract did not harvest the crop but that someone else did, the Commissioner had no-authority to devise a theory of vicarious liability based upon his speculation that the fruit, although harvested by someone else, was “picked pursuant to, and by virtue of,” such contract or “because” of the contract —whatever that may mean.
2. If the Commissioner proceeded under the “broadened provisions” or “broadened authority” of the amendments added in 1949 to § 601.64(4), Florida Statutes, F.S.A., then Townsend had a right to be notified and charged accordingly. Had such been done the grave constitutional questions raised thereby would have been brought to light immediately instead of being covered by a basket until judicial review is sought— *367 thus resulting (as I conceive the majority opinion to do) in our implied approval of the validity of such sections.
3. Regardless of the above, the record made is hopelessly insufficient to constitute competent substantial evidence to sustain the Commissioner’s action; and our authority to review and reverse on appeal from certiorari in the lower court is unquestioned.[8]
4. We must be concerned with the provisions of the statutes which now, under the majority opinion, will make the findings and order of the Commissioner prima facie evidence of the facts — thus obviating the necessity of competent substantial proof sufficient to sustain a proper complaint in an action in a court of competent jurisdiction. The result, as every lawyer must know, is a foregone conclusion and we should not blind ourselves to established fact.
5. Under no circumstances should we extend or enlarge the power to deprive one ■of a license to engage in a lawful or legitimate calling or undertaking; and we cannot justify such action by engaging in a useless battle of semantics by referring to such license as “merely a privilege” which is neither a contract, nor a property right. The deprivation or suspension thereof can only be effected by due and proper notice in accordance with the basic elements of due process.
I would therefore reverse with direction to quash the order of the Commissioner.

. Just exactly what kind of “officer” of the Department of Agriculture there is beside the Commissioner himself is not made to appear except as he is self-styled in the notice served. Actually the notice is on the letterhead of the Department of Agriculture showing it to have come from “Citrus & Vegetable Inspection Division, J. F. Mays, Assistant Director Bond & license Department.” It is signed by the said Mays as the “duly designated officer” and the same individual presided at the hearing, rendering the so-called findings to the Commissioner. Of, Article III, § 27, Constitution of Florida F.S.A. This constitutional restriction is further apparently-disregarded in § 601.71, Florida Statutes 1955, F.S.A. which refers to “officers”' of the Commissioner.

. The telephone call which Conoley testi-ed about from the mysterious person whom he could not identify was obvious- - ly incompetent under any rule of evidence.

. See De Groot v. Sheffield, Fla.1957, 95 So.2d 912; Kashin v. Food Fair, Inc., Fla., 97 So.2d 609; Tropical Park Inc., v. Ratliff, Fla., 97 So.2d 169; Parsons, The Substantial Evidence Rule in Florida Administrative Law, VI U.Fla. L.Rev. 481 (1953).

.The following eases are cited solely for the purpose of showing how an unwar *363 ranted statement by way of dictum in a mere concurring opinion by a single judge can later become the predicate of erroneous decision: Bowers v. Dr. P. Phillips Co., 1930, 100 Fla. 695, 129 So. 850; Roe v. Winter Haven Co., 1932, 104 Fla. 317, 140 So. 463; Metcalf v. R. D. Keene & Co., 1935, 122 Fla. 27, 164 So. 704 (The dictum occurred in the concurring opinion of Ellis, P. J.); Gregg Maxcy Inc., v. Bateman, 1937, 126 Fla. 747, 171 So. 811 (The dissenting opinion of Mr. Justice Brown is unanswerable) ; Winter Haven Fruit Sales Corporation v. C. L. Bundy & Sons, Inc., 1937, 128 Fla. 324, 174 So. 726; Givens v. Vaughn-Griffin Packing Go., 1941, 146-Fla. 575, 1 So.2d 714.

. Nor was the Supreme Court at all concerned with the question oí whether the contract involved had brought about an immediate passage of title to the crop.

. It is recalled that Lent was held in abeyance by agreement of counsel in the Circuit Court pending the decision in Market Fruit.

.That this is the sole theory on which the Commissioner proceeded is conclusively made to appear by the following language from the return of the Commis *365 sioner to the writ of certiorari issued by the court below:
“ * * * (A)nd further avers that the issue before this respondent in said administrative proceeding did involve a charge that petitioners herein had violated a provision of the Florida Citrus Code applicable to citrus fruit dealers, namely, the failure or refusal truly and correctly to account and make full payment of such amounts as may be due by tlie petitioners upon a transaction for the purchase by petitioners of citrus fruit, which said charges are made a violation of the Florida Citrus Code by the provisions of Section G01.64, Florida Statutes, 3955 [F.S.A.l."

. Section 601.68, Fla.Statutes 1955, F.S.A.; and footnote 69 tb Rogers and Baxter, Certiorari in Florida, IV U.Fla.L.Rev. 477, 493-494 (1951) where it is stated:
“ * * * (W)henever quasi-judicial actions of boards, bodies, officers, and commissions are reviewed by certiorari, the Supreme Court has said that the scope of review is not limited to questions of jurisdiction and regularity of pro■cedure but extends to all questions of law, .and that ‘simple errors’ will be corrected. (Citations omitted.) Between 1930, when the rule was first announced and applied, and 1950, when it was reiterated, the Supreme Court has repeatedly reviewed commission orders, in line with the doctrine announced, thus applying and tacitly reaffirming the rule. It has not discussed the rationale of the distinction, and some lawyers doubt the validity of making a distinction between the scope of the review of judicial and quasi-judicial action; however, the distinction is now well settled.”